# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, <br><br> Plaintiff, <br><br> v. <br><br> PREEMINENT PROTECTIVE SERVICES, INC., <br><br> Defendant. | Case No. 1:17-cv-01679 (TNM) |

## MEMORANDUM OPINION[1]

Service Employees International Union Local 32BJ (the "Union") brought this case to compel Preeminent Protective Services, Inc. ("Preeminent") to arbitrate a dispute about two Union members. Despite a clear court Order directing the parties to arbitrate, Preeminent dragged its feet for over a year. It took dozens of attorney hours, three show cause hearings, two failed arbitrations, and a civil contempt Order for Preeminent to comply. The original dispute itself is now overshadowed by Preeminent's stonewalling. The issue here is what amount of the Union's attorneys' fees Preeminent should bear because of its long and calculated obstruction.

The year-long effort to force Preeminent's compliance cost the Union over $50,000 in attorney hours and expenses. Preeminent requested that the Court mitigate the amount owed because of its limited ability to pay. After considering the parties' briefings, the Court rejects Preeminent's inability-to-pay arguments. Preeminent alone caused the delay. And Preeminent alone must bear the costs of its contemptuous and dilatory tactics. For the reasons stated below, the Court will order Preeminent to pay the Union's attorneys' fees and expenses.

---

[1] NOTE: Portions of this opinion contain Sealed Material, which has been redacted.

## I. BACKGROUND

After reviewing the parties' arguments on the merits of the case, in May 2018 the Court agreed with the Union and ordered Preeminent to arbitrate. *See* Order (May 9, 2018), ECF No. 14. Four months later, Preeminent still had not entered arbitration. The Union filed for a show cause order, suggesting Preeminent should be held in contempt for violating the Court's Order. *See* Pl.'s Mot. for Order to Show Cause, ECF No. 15.

In response, the Court held the first of three show cause hearings. *See* ECF Minute Entry (Nov. 16, 2018). At this hearing, and with the hope of encouraging arbitration, the Court ordered the parties to split the cost of arbitration but determined that a contempt order was premature. *See* Hr'g Tr. 8:19–9:4 (Nov. 16, 2018), ECF No. 33. The Court continued the show cause hearing until January 3, 2019, with the understanding that it would be discharged upon completion of arbitration. *Id.* at 9:6–9. And the Court warned Preeminent against any further refusal to pay its half of the arbitration costs. *Id.* at 9:10–11.

The Union immediately tried to resume the arbitration process, but within two weeks Preeminent refused to pay and forced the recusal of a potential arbitrator. *See* Status Report, Ex. A, ECF No. 20-1. The arbitrator required a written assurance of payment "[g]iven Preeminent's history of denying [its] responsibility" to pay its share of the arbitration. *Id.* at 3. But Preeminent refused, forcing the arbitrator's recusal. *Id.* at 2. In his recusal, the arbitrator noted that Preeminent's actions amounted to "an effective refusal . . . to participate in good faith in this Arbitration proceeding" and showed that "Preeminent has no intention of ever paying its share." *Id.* The arbitrator also "strongly suggest[ed] that the Court be notified of Preeminent's continued refusal to participate fully, and in the required good faith." *Id.*

Shortly afterward, the Union informed the Court, *see* Status Report, ECF No. 20, prompting the second show cause hearing. *See* ECF Minute Entry (Jan. 3, 2019). There, the

Court recounted the history of the case to date, including its clear order at the first hearing "that Preeminent needed to agree to pay its half of the arbitration." Hr'g Tr. 16:16–17. Then the Court found that Preeminent "repeatedly" and "explicitly ignor[ed] the continued request from [the arbitrator and the Union] to agree to pay their half to allow the arbitration to commence." *Id.* at 17:11–13, 19:15. The Court noted that it "continued the show cause hearing . . . to ensure [its] order was followed and that the arbitration took place. Neither happened." *Id.* at 18:17–20. And the Court warned Preeminent in no uncertain terms that it could not ignore court orders or dictate their terms. *Id.* at 18:24–19:1.

After denying Preeminent's "borderline frivolous" motion for attorneys' fees, and to compensate the Union for the time it had wasted to date, the Court granted the Union's motion for attorneys' fees and invited a memorandum outlining its fees and expenses. *Id.* at 19:16–24, 23:12–15; *see* Def.'s Resp. to Show Cause Order and Mot. for Atty's Fees, ECF No. 16. The Union identified nearly $20,000 in fees. *See* Pl.'s Mem. in Support of App. For Atty's Fees ("Pl.'s Fee Mem."), ECF No. 24.

Even so, Preeminent dragged its feet in paying the second arbitrator, delayed arbitration yet again, and willfully forced the recusal of the arbitrator. *See* Hr'g Tr. 25–26 (June 6, 2019). After being "shocked and disappointed" to learn the circumstances of the first arbitrator's recusal, the second arbitrator insisted upon "enforceable assurances from both parties that I will be paid for my services." *See* Def.'s Mot. to Cont. (4/23/2019), Ex. 7, ECF No. 34-7. Through back-and-forth with both parties, the second arbitrator proposed a revised fee agreement that incorporated the parties' suggested language. *See* Errata Entry, Ex. A ("Sec. Arbitrator's Recusal") 2, ECF No. 39-1; *see* Hr'g Tr. 25:10–12 (June 6, 2019). But Preeminent failed to sign by the deadline. *See* Sec. Arbitrator's Recusal at 2. After receiving an extension, Preeminent

3

signed the fee agreement but continued to delay its invoice payment. *Id.*; *see* Hr'g Tr. 25:17–19 (June 6, 2019). When Preeminent still had not remitted payment within hours of the new deadline, the arbitrator reached out to the parties by email with a final notice. *See* Sec. Arbitrator's Recusal at 2.

In response, Preeminent claimed—without cause—that the arbitrator was biased against it and in favor of the Union. *See id.* The arbitrator replied that "based solely on [the first arbitrator's] recusal email," his only concern was ensuring he was paid for his services. *Id.* at 3. He also noted "that during my 30 plus years as a neutral, my reputation regarding impartiality as an Arbitrator or a Mediator has never been questioned." *Id.* Maintaining his neutrally, the arbitrator insisted once again that both parties abide by their fee agreement. *Id.* Preeminent finally remitted payment later that day. *See id.* But before the scheduled arbitration, Preeminent challenged the arbitrator once again, contending that his messages regarding payment indicated a bias against Preeminent that "any objective observer" would interpret as partiality. *See id.*

This final challenge led directly to the arbitrator's recusal. After describing Preeminent's challenges, he found that "its attack upon my impartiality put me in an untenable position as the arbitrator of this case." *Id.* He predicted that no matter which way he ruled on the Union's grievances, Preeminent's challenges lay the foundation for a challenge; either from the Union "because of Preeminent's allegations of prejudice," or from Preeminent, who "would believe that my decision confirmed its allegations that I was prejudiced." *Id.* He formally recused himself and directed the parties to find another arbitrator. *Id.; see* Status Report, Ex. A at 2. As a piece of parting advice, he "strongly suggest[ed] that payment for arbitration services be handled before or immediately after the arbitrator is selected." *Id.* n.2.

4

In June 2019, more than a year after the initial Order directing arbitration, the Court held a third show cause hearing, which the clients were required to attend. *See* ECF Minute Entry (June 6, 2019). The Court found "clear and convincing evidence that Preeminent has violated the Court's clear and unambiguous orders compelling arbitrations" through "a deliberate strategy to delay, perhaps indefinitely, the arbitration I ordered." Hr'g Tr. 21:4–11, 27:1–3 (June 6, 2019). So the Court held Preeminent in civil contempt and ordered a $20,000 sanction if Preeminent failed to arbitrate within 30 days. *See* Conditional Order of Civil Contempt, ECF No. 40. Properly motivated, Preeminent finally completed arbitration with the Union—418 days after the Court's initial order. *See* Notice of Completion of Arbitration Hearings, ECF No. 41; Order, ECF No. 14.

In its June 2019 Order, the Court also ordered Preeminent to pay all the Union's attorneys' fees accrued as a direct result of Preeminent's contemptuous behavior, which the Court calculated by the date of the first show cause hearing in November 2018. *See* Conditional Order of Civil Contempt at 2. At the Court's direction, the Union filed a supplemental memorandum listing nearly $50,000 in fees and expenses not already in its previous filings, and Preeminent responded. *See* Pl.'s Mem. in Supp. of Attys' Fees and Costs ("Pl.'s Second Fee Mem."), ECF No. 42; Def.'s Mem. in Opp'n, ECF No. 44.

After reviewing both parties' briefs on the payment of attorneys' fees, the Court requested supplemental briefing about Preeminent's ability to pay the Union's attorneys' fees and expenses. *See* Order (Aug. 6, 2019), ECF No. 47. The Court has received the parties' supplemental briefs and the issue is now ripe for decision. *See* Pl.'s Sealed Mem., ECF No. 48; Def.'s Sealed Opp'n, ECF No. 52.

## II. LEGAL STANDARD

Federal courts possess "inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (cleaned up). This inherent power includes the ability to hold a bad-faith litigant responsible for reimbursing the other side's legal fees and costs. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). When acting under this inherent authority, the Court must take care only to issue sanctions that are compensatory, not punitive. *Goodyear Tire*, 137 S. Ct. at 1186.

A compensatory award must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (cleaned up). To make this assessment, the Court awards fees to the wronged party that it would not have incurred but for the other side's bad faith. *Fox v. Vice*, 563 U.S. 826, 836 (2011). The Court awards the sum of the fees that "would not have been incurred in the absence of the sanctioned conduct." *Goodyear Tire*, 137 S. Ct. at 1187. But as exacting as the Court must be in linking the award to misconduct, the goal "is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838.

## III. ANALYSIS

**A. Preeminent's Bad-Faith Tactics Caused the Union to Incur Fees and Expenses**

The Union's first memorandum for attorneys' fees listed 35.9 hours of work through January 9, 2019, for $19,962 in fees. Pl.'s Fee Mem. But the Court determined that some of those hours would have been incurred even if Preeminent had complied with the Court's arbitration order. *See* Hr'g Tr. 5:12–15 (June 6, 2019). So the Court ordered Preeminent to pay only the fees incurred after November 16, 2018, the date of the first show cause hearing. *See* Conditional Order of Civil Contempt at 2. Reviewing the Union's memorandum, that cutoff

means Preeminent must reimburse the Union for 16 hours of work listed in the Union's first request for attorney's fees. *See* Pl.'s Fee Mem. at Ex. A.

The Union's second memorandum for fees and costs was more substantial, listing 84.8 hours of work from January 10 through July 15, 2019, for $48,123.20 in fees and expenses. *See* Pl.'s Second Fee Mem. at 4. The fees included work conducted by four attorneys—two in-house and two outside counsel—on the two failed arbitrations and in response to Preeminent's intransigence. *See id.* And the Union incurred $1,706 in documented expenses traveling to the two failed arbitrations. *See id.*

To begin, the Court must determine how much of the Union's expenses listed in the second memorandum directly resulted from Preeminent's sanctioned conduct. *See Goodyear Tire*, 137 S. Ct. at 1187. With only one exception, the Court finds that Preeminent is responsible for all the fees and travel expenses listed in the second memorandum. *See* Pl.'s Second Fee Mem. at 4. As the Court made clear in its Conditional Order of Civil Contempt, nearly every action after November 18, 2018 resulted from Preeminent's dilatory tactics. *See* Conditional Order of Civil Contempt at 2. All the time and travel expenses claimed by the two in-house counsel were a direct result of Preeminent's last-minute sabotage of the failed arbitrations. *See* Pl.'s Second Fee Mem. at 4, Sanchez Decl. ¶ 6, Chan Decl. ¶ 2. The Court finds Preeminent should bear the expense for all 28 hours of Betzabeth Sanchez's time, all 9.5 hours of Melissa Chan's, and the $1,706 in travel expenses.[2] *See id.* at 4.

Nearly all the time the two outside counsel spent on the case this year was also in response to Preeminent's meritless court filings. *See* Pl.'s Second Fee Mem. at 2–4, Stephens

---

[2] Although the Union's second fee memorandum lists 29 hours for Ms. Sanchez's time, it is apparent that the correct figure is 28 hours. Her declaration lists only 28 hours spent on the case and the Union's own calculation is based on that 28-hour figure. *See id.* at 4; Sanchez Decl. at Ex. B.

Supp. Decl. ¶ 10, Ex. A. The Court finds that the Union would not have incurred most of these fees but for Preeminent's bad faith. *See Fox*, 563 U.S. at 836.

The one exception for which the Court will not hold Preeminent responsible is the Union's work responding to Preeminent's Motion for Reconsideration of the Court's January 3, 2019 Order awarding attorneys' fees to the Union. *See* ECF No. 28. Unique among Preeminent's filings listed in the Union's second memorandum, the Motion for Reconsideration raised salient points about the calibration of the Court's award of attorneys' fees. *See id.*; Pl.'s Second Fee Mem. at 4.

As the Court explained at the third contempt hearing, after reviewing Preeminent's Motion for Reconsideration, the Court amended its previous ruling to the extent "that attorneys' fees for services rendered up through November 16th, 2018 should not be assessed" because it was really after that date that "the contemptuous behavior [became] crystal clear." *See* Hr'g Tr. 5:12–15, 7:19–21 (June 6, 2019). Although the Court noted a good argument could be made "that even the behavior predating the 16th was part of [Preeminent's] effort to obstruct and avoid [the Court's] original order," the Court decided "out of an abundance of caution" not to assess any fees related to work before then. *See id.* at 30:10–14. Because of that, the Court cannot declare Preeminent's Motion for Reconsideration a wasteful tactic.

Of the fees in the Union's second memorandum, the outside counsel devoted 10.6 hours to this case between January 24 and February 6, 2019, the dates Preeminent filed its Motion for Reconsideration and the Union filed its Opposition. *See* Pl.'s Second Fee Mem. at Ex. A. The Union mainly spent that time reviewing, researching and drafting its Opposition, so the Court will not hold Preeminent responsible for the fees associated with those 10.6 hours. *See id.* Subtracting that time from the outside counsels' total claimed work results in a difference of 36.7

8

hours; 1.3 for Michael Anderson and 35.4 for Arlus Stephens. *See id.* at 4, Ex. A. Preeminent will bear the cost of those 36.7 hours.

### B. The *Laffey* Rate Yields an Appropriate Calculation for the Union's Fees

Having determined the amount of work hours for which Preeminent is responsible, the Court must calculate a dollar award. The Union's position is that the Court should multiply the hours worked by the prevailing market rates in the *Laffey* Matrix, named for *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983). *See* Pl.'s Second Fee Mem. at 4–6. The U.S. Attorney's Office publishes this matrix on its website as market rates are updated.[3]

Preeminent's counterargument is that the rates in the *Laffey* Matrix exceed the Union's actual expenses, and that without evidence of the Union's actual expenses the Court cannot tailor an appropriate award.[4] The Court disagrees and will apply the *Laffey* rates.

The Supreme Court and the D.C. Circuit have consistently found that courts should apply a reasonable hourly rate to calculate "an objective basis on which to make an initial estimate of the value of a lawyer's services." *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Bd. of Trustees of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998). Multiplying "the hours reasonably expended in the litigation by a reasonable hourly fee" produces what is called a "lodestar" figure, which typically represents "a reasonable fee." *Local 25*, 136 F.3d at 801 (cleaned up).

The Union does not contest that its attorneys "discount their hourly rates" for the Union because as a nonprofit, it "cannot afford market rates." *See* Pl.'s Second Fee Mem. at 5. But that is no basis to award a lower rate. The D.C. Circuit has repeatedly affirmed "that a party whose

---

[3] *See* USAO Attorney's Fees Matrix — 2015–2019, https://www.justice.gov/usao-dc/file/796471/download.
[4] Astonishingly, Preeminent also renewed its argument "that it has complied with the Court's Orders concerning arbitration and has not engaged in conduct to frustrate arbitration." *See* Def.'s Opp. at 1. But the Court will not relitigate this issue after devoting more than a year to enforcing its Order for arbitration.

9

attorney charges a discounted rate for public-spirited reasons may nevertheless receive an award of fees at market rates." *Local 25*, 136 F.3d at 801; *see also Save Our Cumberland Mtns., Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc). It is appropriate to award a market rate so long as the attorney "had public-spirited reasons for charging reduced rates," *Local 25*, 136 F.3d at 806, and not merely "because they cannot command anything more," *Covington v. District of Columbia*, 57 F.3d 1101, 1108 (D.C. Cir. 1995). The Court finds ample evidence that the Union's outside counsel are skilled attorneys who could command a higher rate but chose to discount their services for the Union because of its advocacy efforts. *See* Pl.'s Second Fee Mem. at 5; Stephens Supp. Decl.

The Court will also apply the *Laffey* Matrix for the two in-house counsel. Courts in this District have followed *Local 25* and *Covington* to award *Laffey* rates for salaried government attorneys in sanction awards. *See e.g.*, *Davis v. D.C. Child and Family Svcs. Agency*, 304 F.R.D. 51, 63–64 (D.D.C. 2014) (applying market rates for D.C. government attorneys in Federal Rule 37 discovery sanction award); *Fowler v. District of Columbia*, No. CIV.A. 00-270, 2001 WL 1704308, at *1 (D.D.C. Aug. 16, 2001). Although the Union's in-house counsel are not government attorneys, the Court finds that the principles underlying *Local 25* and *Covington* support the application of market rates for in-house counsel. *See Local 25*, 136 F.3d at 806; *Covington*, 57 F.3d at 1108. Applying *Local 25*'s "strong presumption that the lodestar figure represents a reasonable fee," the Court will apply the *Laffey* Matrix for the Union's in-house counsel. *See* 136 F.3d at 801 (cleaned up).

Looking to the current version of the *Laffey* Matrix, the Court applies the following hourly compensation:

- Mr. Anderson, with 31 years of experience, is entitled to the maximum available rate of $613 per hour;

- Mr. Stephens, with 22 years of experience, is entitled to $572 per hour;

- Ms. Sanchez, with 18 years of experience, is entitled to $544 per hour; and

- Ms. Chan, with nine years of experience, is entitled to $417 per hour.

*See* USAO Attorney's Fees Matrix — 2015–2019.

As noted above, the Court will order Preeminent to compensate Mr. Anderson for 1.3 hours of work; Mr. Stephens for 35.4 hours; Ms. Sanchez for 28 hours; and Ms. Chan for 9.5 hours. Applying these hours to each attorney's market rate, Preeminent must pay $796.90 for Mr. Anderson's fees; $20,248.80 for Mr. Stephens' fees; $15,232 for Ms. Sanchez's fees; and $3,961.50 for Ms. Chan's fees. These total $40,239.20, the lodestar figure that Preeminent must compensate the Union for the work since January 9, 2019. *See Local 25*, 136 F.3d at 801.

The Court also finds that the Union's travel expenses associated with the two failed arbitrations are reasonable and compensable. *See Harvey v. Mohammed*, 951 F. Supp. 2d 47, 69 (D.D.C. 2013). Preeminent will pay the $1,706 in Union travel expenses from the two failed arbitrations. *See* Pl.'s Second Fee Mem. at 4.

And to be clear, that $41,945.20 figure does not include the award that the Court previously ordered Preeminent to pay. *See* Conditional Order of Civil Contempt at 2; Hr'g Tr. 19:22–24, 23:12–15 (Jan. 3, 2019). Preeminent must also compensate the Union for the 16 hours of work that Mr. Stephens performed from November 17, 2018 to January 9, 2019. *See* Pl.'s Fee Mem. at Ex. A.; Conditional Order of Civil Contempt at 2. Applying the same market rate of $572 per hour, Preeminent must pay $9,152 for Mr. Stephens' time captured in the Union's first memorandum. *See id.* This brings the grand total to $51,097.20.

### C. Preeminent has Not Shown it Cannot Pay

Preeminent has raised several objections to the Union's requested fee award. Preeminent argues that the award is impermissibly punitive, rather than compensatory. *See* Def.'s Mem. in Opp'n at 3. But the Court need not spend long addressing that argument because—as the Court has shown above—the fee award has been closely calibrated to Preeminent's bad faith and is not issued for any punitive reason. *See Goodyear Tire*, 137 S. Ct. at 1186.

The Court will, however, address Preeminent's argument that the fee award should be mitigated because of an inability to pay. *See* Pl.'s Sealed Mem. The Court finds Preeminent's claims unpersuasive and will order the full fee award of $51,097.20.

Preeminent has not cited a single case in which a court has mitigated its compensatory award because of a party's inability to pay. *See* Pl.'s Sealed Mem. On the other hand, the Union has pointed to several cases suggesting the Court should not consider Preeminent's financial situation. *See* Def.'s Sealed Opp'n, at 2–6. Applying compensatory sanctions under 28 U.S.C. § 1927, Judge Huvelle found inability to pay irrelevant in *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 130 (D.D.C. 2012). And the Seventh and Tenth Circuits have come to the same conclusion, reasoning that a compensatory award should reflect the wronged party's expense rather than the wrongdoer's means to pay. *See Shales v. Gen. Chauffeurs, Sales Drivers & Helpers Local Union No. 330*, 557 F.3d 746, 749 (7th Cir. 2009) ("Damages depend on the victim's loss, not the wrongdoer's resources."); *Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1205 (10th Cir. 2008) (finding that § 1927 reflects a "victim-centered approach").

The Court finds these cases persuasive, particularly the detailed discussion in *Shales* suggesting that "district judges should let the bankruptcy proceeding handle all debts and all creditors at one go" rather than mitigate an individual award with imperfect information. *See*

*Shales*, 557 F.3d at 749–50. This is not a bankruptcy court, and the Court has no information about Preeminent's other debts, if there are any. But the D.C. Circuit has not spoken directly on this issue and there is no need to hold that Preeminent's inability to pay is irrelevant here. Instead, the Court will assess Preeminent's claims on their facts, as the D.C. Circuit did in *United States v. Gewin*, 759 F.3d 72, 82 (D.C. Cir. 2014) (rejecting "inability to pay" claims on factual grounds without deciding whether such claims are legally viable).

Turning there, the Court finds Preeminent's evidence scant and unpersuasive. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

But as the Union points out, Preeminent's evidence "raises more questions than it answers." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Court gives little credit to Preeminent's evidence, but even if

13

Preeminent's claims were more credible, "business losses are not equivalent to claims of inability to pay." *See Lakeland Bus Lines, Inc. v. N.L.R.B.*, 347 F.3d 955, 962 (D.C. Cir. 2003).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Searches through District of Columbia and federal government public records databases show active Preeminent contracts worth over $2.5 million, plus a future federal government contract in 2020. ████████████████████ The Union also found a Preeminent contract with the Maryland Stadium Authority to provide security at Baltimore's M&T Stadium and Oriole Park at Camden Yards. ██████ Preeminent's own website claims over 200 clients served, and it boasts that since its founding in 2001, "Preeminent has never missed a payroll" and that all "obligations are paid to date." ██████ Preeminent provided the Court with none of this information, casting further doubt on its evidence. The information the Union could discover from a cursory review of publicly-available sources paints a far more fertile picture than Preeminent's purported barren landscape. The Court is unmoved by Preeminent's dubious evidence and will not reduce the fee award that Preeminent owes the Union.

## IV.    CONCLUSION

Preeminent's conduct here has been dilatory and contemptuous. The Union wasted dozens of hours pursuing just the opportunity to arbitrate with Preeminent over its now-overshadowed labor dispute. Despite "numerous admonitions from the Court, an award of attorneys' fees to the Union, and multiple opportunities to remedy the situation," for months on end it was "Preeminent and only Preeminent that . . . prevent[ed] arbitration from occurring" in this case. Hr'g Tr. 27:24–25, 29:16–18 (June 6, 2019). As a result, Preeminent must compensate the Union for its time.

For all these reasons, and in consideration of the entire record of Preeminent's misconduct here, the Court will order Preeminent to pay the Union $51,097.20 in attorneys' fees and expenses. A separate Order will issue.

_____
Dated: November 8, 2019                           TREVOR N. McFADDEN, U.S.D.J.